The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. On the date of plaintiffs alleged contraction of an occupational disease, the parties were subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. On that date, an employment relationship existed between plaintiff and defendant.
3. Plaintiffs average weekly wage was $450.83.
4. A set of eight exhibits, identified in paragraph I, F of the parties Pre-Trial Agreement, shall be admitted into evidence.
***********
Based upon all of the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was fifty-two years old. She was five feet, four inches tall. She completed eleven and one-half years of formal education. She began working for defendant in 1990 as a high speed machine operator. Beginning in 1988, plaintiff worked as a high speed machine operator for defendants predecessor, Bahlsen. During her employment by defendant, plaintiff worked on several different lines. For three years, she worked on the "400 line.
2. Defendant was a manufacturer of snack foods, including cracker sandwiches containing a variety of fillings. The crackers used to make the sandwiches were made in defendants bakery and were moved mechanically to the high speed machines which made the crackers into sandwiches. The machine also wrapped completed cracker sandwiches in cellophane wrappers.
3. The crackers came into the machines from the rear along an elevated conveyor. As the crackers approached the machine, they were divided into single lines. Each line flowed into one of four chutes that entered directly into the rear of the machine. Where they entered the machines, the chutes were positioned above shoulder height.
4. "Bad crackers, crackers that were broken, unevenly spaced or otherwise incorrectly positioned in the chutes, would cause "hang ups or "jams requiring the machines to be shut down. To prevent "jams and shut downs, plaintiff and the other machine operators were responsible for monitoring the crackers as they entered the rear of the machines. If a "bad cracker was detected entering the machine, the machine operator was responsible for removing the cracker before it entered the machine. Plaintiff was required to reach over shoulder height to remove "bad crackers from the chutes. Plaintiff testified that her work on the "400 line required her to lift her arms to shoulder height or above and to keep them at shoulder height for over half of her workday in order to correct the "hang-ups and "jams that occurred.
5. In addition to monitoring the high speed machines operation, plaintiff was responsible for keeping her high speed machine filled with a roll of cellophane film used to package completed sandwiches. The rolls of cellophane film weighed approximately thirty pounds. To replace an empty roll of cellophane film, plaintiff was required to lift the new roll over her head. Plaintiff performed this task once every forty-five minutes when the machines were operating at their most efficient levels.
6. In March 1995, defendant assigned plaintiff to work on its new "400 line as a machine operator. During the first three to four months of the new lines operation, it experienced a greater number of problems than were usual for a high speed production line. In fact, plant manager Daryl Tew testified that in the first several months from March 1995 through July or August 1995, there were 25% more instances in which there were "hang-ups or "jams in the tubes that feed the high speed machines with cracker wafers. By October 1995, the "400 line began operating at an efficiency level commensurate with the other high speed production lines. Plaintiff continued to work as a machine operator on the "400 line through June 1997.
7. Mr. Tew testified that there were around 90 "hang-ups and "jams occurring per shift with each shift lasting seven and a half hours. This would amount to 12 "hang-ups and "jams per hour or one every five minutes during a shift. This is consistent with the testimony of plaintiff that she spent more than half the day with her arms at or above shoulder height while performing her job duties.
8. The Full Commission finds the testimony of plaintiff and Mr. Tew to be credible. The Full Commission gives little weight to the report of Debra Lord, in that it was based on a one and a half hour review of the job of a different workers compensation claimant and was based on conditions existing in 1998, which was three years after the plaintiff began working on the "400 line. Fewer "hang-ups and "jams were occurring in 1998 as opposed to the initial operation of the "400 line in 1995. Ms. Lords report based on 1998 conditions has little reliability with respect to 1995 conditions and thus is not helpful on the issue of repetitive use of the upper extremities in 1995.
9. In May 1997, plaintiff began experiencing pain and stiffness in her right shoulder. The same symptoms then began to appear in her left shoulder. Eventually she experienced the same symptoms in both shoulders, simultaneously, with the symptoms in her left shoulder being most severe. These symptoms significantly interfered with her ability to raise her arms above shoulder height.
10. Upon referral by her family physician, plaintiff presented to Dr. Andersen on July 18, 1997. Dr. Andersen is licensed in North Carolina and is board-eligible for orthopaedics. Dr. Andersen diagnosed plaintiff with adhesive capsulitis. He testified that he sees ten to 20 cases of rotator cuff tendinitis a month and that the condition is commonly associated with overhead activity. Dr. Andersen prescribed physical therapy for the plaintiff and on July 23, 1997 excused plaintiff from work for two weeks. Dr. Andersen subsequently extended plaintiffs excuse from work through January 1998.
11. By January 13, 1998, plaintiffs health insurance coverage had changed and she began receiving treatment for her shoulders from Dr. Wyker, who has been a board-certified orthopaedic surgeon since 1989 and specializes in the treatment of shoulders. Dr. Wyker diagnosed plaintiff as having bilateral adhesive capsulitis in January of 1998. He continued plaintiffs work excuse through March 1998. Plaintiff returned to work for defendant as a high speed machine operator on the "400 line on April 22, 1998. Plaintiff continued to work in that position through the date of the hearing before the deputy commissioner. Dr. Wykers notes from October 14, 1998 state that "Ms. Williams returns for reevaluation of her left shoulder rotator cuff tendinitis adhesive capsulitis. After the physical examination, Dr. Wykers impression was that plaintiff was suffering from "chronic rotator cuff tendinitis.
12. Dr. Andersen testified that it is possible for a patient to have both rotator cuff tendinitis and frozen shoulder and stated, "I think that there is overlap in that inflammation of the rotator cuff is part of both. So, if I call it an adhesive capsulitis, I am including inflammation in the rotator cuff under that diagnosis. Dr. Wyker testified, and the Full Commission finds as fact, that a diagnosis of adhesive capsulitis and rotator cuff tendinitis "go together and were "a continuum whose diagnosis depended on the relative degrees of pain and stiffness associated with the patients shoulder condition.
13. Plaintiffs duties as a high speed machine operator required frequent overhead lifting of thirty pounds and constant overhead reaching without weight to clear "hang-ups and "jams in the chutes of the "400 line.
14. Dr. Wyker testified, and the Full Commission finds as fact, that constant reaching forward and overhead and/or frequent lifting of thirty pounds overhead would place the plaintiff at an increased risk, greater than that of the public in general, of contracting bilateral adhesive capsulitis and chronic rotator cuff tendinitis. Dr. Andersen testified, and the Full Commission finds as fact, that rotator cuff tendinitis is associated with overhead activity and the more repetitive the activity the more likely that rotator cuff tendinitis will develop. Plaintiffs employment with defendant did cause or significantly contribute to her bilateral adhesive capsulitis and chronic rotator cuff tendinitis and her employment did place her at an increased risk of developing that condition as compared to members of the general public not so employed.
15. Dr. Wyker assigned a 4% permanent functional impairment rating to plaintiffs right arm and a 10% permanent functional impairment rating to the plaintiffs left arm as a result of her adhesive capsulitis and chronic rotator cuff tendinitis.
***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiffs bilateral adhesive capsulitis and chronic rotator cuff tendinitis were due to causes or conditions that were characteristic of or peculiar to her employment and therefore, are occupational diseases. N.C. Gen. Stat. 97-53(13)
2. Plaintiff is entitled to receive temporary total disability compensation in the amount of $300.57 per week for the time period beginning July 23, 1997 and ending April 22, 1998. N.C. Gen. Stat. 97-29.
3. Defendant is entitled to a credit for the short term disability that was paid to the plaintiff during the time period beginning July 23, 1997 and ending April 22, 1998.
4. Plaintiff is entitled to compensation at the rate of $300.57 for 9.6 weeks for the 4% permanent partial disability rating to the right arm and 24 weeks for the 10% permanent partial disability rating to the left arm. N.C. Gen. Stat. 97-31(13).
5. Plaintiff is entitled to reimbursement of all medical expenses incurred by the plaintiff as a result of her occupational disease which are reasonably required to effect a cure or give relief or will tend to lessen the period of disability. N.C. Gen. Stat.97-25.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay temporary total disability compensation in the amount of $300.57 per week for the time period beginning July 23, 1997 and ending April 22, 1998. This shall be paid in a lump sum to plaintiff subject to a reasonable attorneys fee and also subject to a credit hereinafter awarded.
2. Defendant is entitled to a credit for the short term disability that was paid to the plaintiff during the time period beginning July 23, 1997 and ending April 22, 1998.
3. Defendant shall pay plaintiff compensation at the rate of $300.57 for 9. 6 weeks for the 4% permanent partial disability rating to the right arm and 24 weeks for the 10% permanent partial disability rating to the left arm. This shall be paid in a lump sum to plaintiff subject to a reasonable attorneys fee.
4. Defendant shall pay plaintiff interest on all compensation from the date of the hearing before the deputy commissioner until paid.
5. Defendant shall pay all medical expenses incurred by the plaintiff as a result of her occupational disease which are reasonably required to effect a cure or give relief or will tend to lessen the period of disability.
6. A reasonable attorneys fee of twenty-five percent of the compensation due plaintiff under paragraphs 1 and 3 of this Award is approved for plaintiffs counsel and shall be paid as follows: twenty-five percent of the lump sums due plaintiff shall be paid directly to plaintiffs counsel.
7. Defendant shall pay the costs.
This 24th day of March 2000.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
S/_______________ DIANNE C. SELLERS COMMISSIONER